Mary Lou MIRANDA, Plaintiff–Appellant,

v.

WISCONSIN POWER & LIGHT COMPANY, Defendant–Appellee.

No. 95–3537.

United States Court of Appeals, Seventh Circuit.

Argued May 17, 1996.

Decided Aug. 1, 1996.

Willie J. Nunnery (argued), Madison, WI, for Mary Lou Miranda.

Bradley D. Armstrong, Michael J. Modl (argued), Axley Brynelson, Madison, WI, for Wisconsin Power & Light Co.

Before CUMMINGS, BAUER, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

After she quit her job in 1994, Mary Lou Miranda sued her former employer for allegedly discriminating against her on the basis of her race, age, and physical disability. Ten months later, the district court granted the defendant's motion for summary judgment on all of Miranda's claims for relief. She now appeals only with respect to her claim of race discrimination and her claim that she was constructively discharged by being subjected to a hostile and abusive working environment because of her physical disability. Finding no merit in these claims, we affirm.

I

This appeal arises from the district court's grant of summary judgment to the defendant. In its decision, the district court recited the undisputed facts as illustrated by the record. Neither party has offered a contrary assessment, and so we take those undisputed facts as found by the district court.

Miranda is a Hispanic woman who was employed by Wisconsin Power & Light Company ("WPL") at its customer service center in Janesville, Wisconsin. Miranda held the position of customer service representative, which entails handling telephone inquiries from WPL customers. Two of her supervisors at the center were David Ross and Janet Shields. Whatever the truth of the particulars, it is clear from the record that Miranda chafed under Ross's supervision. She claims that beginning in 1992, he treated her unfairly and in a manner inconsistent with his treatment of her colleagues by restricting her interaction with fellow workers and by singling her out for scrutiny.

In May 1993, Miranda met with Verna Richardson, a WPL human resources manager, to discuss Ross's treatment of her. Miranda alleged that Ross did not allow her adequate time to use the bathroom to accommodate her medical condition and that he had created a hostile working environment by monitoring her more closely than other employees and restricting her interaction with other employees. Richardson summarized Miranda's allegations in a memorandum, which she then shared with Ross.

During her meeting with Ross, Richardson provided him with a copy of a statement by Miranda's physician stating that she suffered from diverticulosis, an intestinal disorder characterized by the presence of small, pouch-like sacs (diverticula) protruding from the intestine. This condition causes painful bowel movements and necessitates frequent trips to the bathroom. It was at this meeting that Ross first learned of Miranda's condition. Following this meeting and the circulation of information regarding Miranda's condition to supervisors in the customer service center, Miranda was allowed to use the bathroom as required. In addition to her diverticulosis, Miranda began to suffer from pain in her right arm and wrist in January 1994, and on the advice of a physician, Ross arranged light-duty work for Miranda during her period of recuperation.

In February 1994, Gary Schmidt, the manager of the customer service center, directed Ross to obtain updated information on Miranda's diverticulosis. Ross prepared a memorandum, and this memorandum was reviewed by other WPL officials. It requested an updated diagnosis and information on the particular accommodations required by Miranda's diverticulosis. Ross submitted this memorandum to Miranda for presentation to her physician.

In October 1993, Ross and Shields notified the center's employees that WPL was creating, and soliciting applications for, five customer service supervisor positions, which would be filled on the basis of merit rather than seniority. Miranda was one of twenty-three people who applied for these positions. WPL decided only to consider the thirteen applicants who were WPL customer service center employees, and of these thirteen, only eleven-including Miranda—had satisfied WPL's two-year service requirement. WPL policy required that an employee applying for an hourly supervisory position submit to a performance evaluation from his or her supervisor. Ross completed an evaluation of Miranda's performance, and the two of them met on November 3, 1993, to discuss the details of the evaluation.

Ross selected Shields and two others to serve with him on panels interviewing appli-

cants for the supervisor positions. Shields, who is white, and Odell Nickelberry, a black man, interviewed the applicants to assess their leadership and communications skills. Ross and Jackie Krayer, both of whom are white, interviewed the applicants to determine their technical qualifications for the positions. Shields and Nickelberry asked each applicant the same five questions and scored answers on a scale of one to five. They scored Miranda with 12 out of a possible 25 points. Ross and Krayer posed thirty-one identical questions to each applicant and scored the applicants individually. In this interview, Miranda achieved 98 out of a possible 155 points.

Following the interviews, Shields, Nickelberry, Ross, and Krayer met to tally the results. The five highest-scoring applicants were offered the positions, and all accepted. Miranda was not among them; in fact, she attained one of the lowest total scores. Miranda's score disqualified her from further consideration for the position, meaning that even if the higher-scoring applicants had declined the positions, WPL would not have offered it to Miranda. All five of the persons selected for the supervisor positions were white.

Miranda subsequently quit her job with WPL and filed this lawsuit on November 22, 1994. In her complaint, Miranda alleged that WPL failed to promote her to a supervisor position on account of her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1991, 42 U.S.C. § 1981, and on account of her age (Miranda was fifty-five at the time the district court granted summary judgment.) in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. She also alleged that WPL violated the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., by subjecting her to conditions of employment not shared by others who did not have her disability, and that this discriminatory conduct of WPL caused her constructive discharge.

WPL filed a motion for summary judgment pursuant to FED. R. CIV. P. 56 on July 14, 1995. The district court granted this motion on September 25, finding that Miranda had failed to provide the requisite quantum of evidence to establish a genuine issue of material fact as to WPL's alleged discrimination. Miranda appeals from that decision only with respect to her claims for relief under Title VII and the ADA.

## II

■ In reviewing a district court's grant of summary judgment, we assess the record de novo and reach our own conclusions of law or fact as they flow from the record before us. See Thiele v. Norfolk & Western Ry. Co., 68 F.3d 179, 181 (7th Cir.1995). This plenary review of the evidence requires that we employ the standard prescribed by FED. R. CIV. P. 56(c) and determine whether the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ We will neither resolve factual disputes nor weigh conflicting evidence; we will only determine if a genuine issue of material fact exists for trial. Such an issue exists if "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If no such issue exists, the sole question is whether the moving party is entitled to judgment as a matter of law. In reaching a conclusion as to the presence of a genuine issue of material fact, we must view the evidence and draw all inferences in a way most favorable to the nonmoving party. Tolentino v. Friedman, 46 F.3d 645, 649 (7th Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995).

### III

#### A

Miranda alleges that WPL's decision not to promote her to the supervisor position was motivated by discriminatory intent in viola-

tion of Title VII of the Civil Rights Act of 1964. Under Title VII, it is unlawful for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1)–(2).

■ Miranda claims that WPL treated her differently than other employees because she is Hispanic. This type of Title VII claim, which is referred to as a "disparate treatment" claim, requires that the plaintiff demonstrate the employer's specific intent to discriminate. This showing may be accomplished either directly, *see Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), or indirectly through the burden-shifting approach announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Miranda has produced no direct evidence of discriminatory intent, and so the framework for addressing her claim under Title VII is that described in *McDonnell Douglas.*

The *McDonnell Douglas* approach requires a four-prong showing to make out a prima facie case of discrimination. In this case, which involves a failure to promote, Miranda must demonstrate by a preponderance of the evidence: (1) that she is a member of a protected class; (2) that she applied and was qualified for a position for which the employer was seeking applicants; (3) that she was not selected for the position; and (4) that the position remained open to others with qualifications similar to Miranda's. *Vitug v. Multistate Tax Comm'n,* 88 F.3d 506, 515 (7th Cir.1996) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824).

■ A successful prima facie case establishes a rebuttable presumption of discrimination, and the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). Should the employer make this showing, the burden of production reverts to the plaintiff to demonstrate that the defendant's proffered rationale for the conduct at issue is pretextual. *Saint Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–08, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993). Despite these shifting burdens of production, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 507, 113 S.Ct. at 2747.

**B**

■ Miranda has not made a prima facie case of discrimination under *McDonnell Douglas,* for she has failed to demonstrate her qualification for the supervisor position. The undisputed facts demonstrate that her score for the interviews placed her at the bottom of the applicant pool and disqualified her from consideration regardless of whether higher-scoring applicants accepted the offered positions. These facts are fatal to Miranda's case under Title VII.

Miranda received the lowest score of all the applicants in the interview concerning leadership and communications skills. And in the second interview, which focused upon technical aspects of the supervisor position, Miranda received the second-lowest score of all the applicants. As found by the district court, these results disqualified her for the supervisor position. Miranda has not disputed that these scores proved her unqualified for the position, as did the plaintiff in *Vitug,* 88 F.3d at 515–16. Miranda has similarly not identified any aspect of those interviews that disadvantaged or prejudiced her with respect to the other applicants, and has therefore failed to raise a genuine issue of material fact as to her qualification for the position.

■ Miranda claims that Ross's racial bias against her led to her being denied the position. In support of this argument, Miranda points to her allegations that Ross had since 1992 treated her differently than other employees and had restricted her interaction with them. This argument recalls the rule that a party opposing summary judgment must do more than raise "metaphysical doubt" as to the presence of a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Miranda's argument, which assumes its conclusion of Ross's bias, does not raise any doubt as to the undisputed evidence that she was not qualified for the supervisor position.

Instead of identifying flaws in the interview process, Miranda points to extrinsic evidence of what she terms "camaraderie" between Ross and Shields and two of the other applicants for the supervisor positions. This evidence concerns one applicant draping Ross's house in toilet paper and the other meeting with Shields outside of work to obtain information regarding the positions. Neither of these incidents suggests any inherent racial prejudice or bias in the interview process. Although one might view such use of toilet paper as the province of high school or college homecoming weekends, *see, e.g.*, SIXTEEN CANDLES (Universal Studios 1984); ANIMAL HOUSE (Universal Studios 1978), a novel expansion of this heretofore sacrosanct practice does not lead to an inference of racial bias. Nor does Shields meeting with the second applicant suggest racial prejudice. In fact, the record suggests that this meeting occurred only because the applicant had been absent from work when the information about the positions was disseminated.

Miranda argues that WPL's statement that she was "minimally qualified" in its answer to her amended complaint vaults her over the qualification hurdle of *McDonnell Douglas*. This argument divorces these two words from the sentence in which they were used. WPL's statement refers to Miranda's minimal qualification to apply for the position. Recall that WPL excluded two potential applicants because they had not put in the required two years of service. As WPL readily admits, Miranda had satisfied the "minimum job requirements" that were prerequisites to applying for the supervisor positions, but her interview scores knocked her out of consideration.

## IV

### A

Miranda also alleges that WPL discriminated against her because of her physical disability by creating a hostile working environment causing her constructive discharge in violation of the Americans with Disabilities Act. The pertinent parts of that Act provide as follows:

> No covered entity [i.e., employer] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). This same section proceeds to define "discriminate" as, among other things, the following:

> (1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;
>
> . . .
>
> (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

42 U.S.C. § 12112(b). The ADA contemplates reasonable accommodations as including modified work schedules, modification of policies, and other similar accommodations. See 42 U.S.C. § 12111(9)(B).

■ The ADA does not obligate an employer to provide a disabled employee every accommodation on his wish list. *See Lester Schmidt v. Methodist Hosp. of*

*Indiana, Inc.,* 89 F.3d 342, 344–45 (7th Cir. 1996); *Stewart v. County of Brown,* 86 F.3d 107, 111–12 (7th Cir.1996). Nor is an employer required to endure undue hardship in accommodating an employee's disability. *See Daugherty v. City of El Paso,* 56 F.3d 695, 700 (5th Cir.1995); *see also* 29 C.F.R. § 1630.9(a). The ADA requires an employer to make whatever accommodations are reasonably possible in the circumstances so as to allow the employee to perform the functions essential to his position. *See Vande Zande v. State of Wis. Dep't of Admin.,* 44 F.3d 538, 542–43 (7th Cir.1995).

The ADA's prohibition against discrimination also applies to an employer's inquiries into the medical condition of an employee. *See* 42 U.S.C. § 12112(d)(4). However, employers may lawfully make such an inquiry if it "is shown to be job-related and consistent with business necessity." *Id.* Thus, an employer may inquire into the ability of an employee to perform functions related to his job. *Id.; see also* 29 C.F.R. § 1630.14(c).

### B

■ The district court correctly noted the lack of authority as to whether a claim of constructive discharge stemming from a hostile working environment is cognizable under the ADA. Such a claim would seem to arise under the general prohibition against discrimination with respect to terms or conditions of employment contained in § 12112(a). *See also* 29 C.F.R. § 1630.4 (stating that it is unlawful to discriminate against a disabled employee in regard to any "term, condition, or privilege of employment").

Although the words of 42 U.S.C. § 12112(a) and 29 C.F.R. § 1630.4 might obviate any need to infer a cause of action for constructive discharge under the ADA, we recognize that claims of constructive discharge are cognizable under Title VII. *See, e.g., Vitug,* 88 F.3d at 516–17. And in analyzing claims under the ADA, it is appropriate to borrow from our approach to the respective analog under Title VII. *See DeLuca v. Winer Indus., Inc.,* 53 F.3d 793, 797 (7th Cir.1995). In the present appeal, we need not decide the question of whether a claim of constructive discharge is cognizable under the ADA because, even assuming that it is, Miranda's claim falls far short of what such a successful claim would require.[1]

As we explained in *Vitug,* a claim of discriminatory constructive discharge requires a plaintiff to demonstrate first that he was constructively discharged—i.e., that the employer "made the working conditions so intolerable as to force a reasonable employee to leave." 88 F.3d at 517. Once the plaintiff has made this showing, he must establish that he was constructively discharged because of his membership in a protected class. *Id.* In this case, if Miranda can prove constructive discharge, she then must show a causal link between WPL's actions and her status as a disabled employee.

Miranda has not offered sufficient evidence to create a triable issue of fact with respect to her constructive discharge. She has failed to identify any actions by WPL that might reasonably be viewed as creating an intolerable work environment. In fact, the undisputed facts show that WPL made every effort to accommodate Miranda's disability. An employer makes accommodations by "making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Vande Zande,* 44 F.3d at 542.

The record unequivocally demonstrates that WPL did this by allowing Miranda unfettered use of the bathroom and by ensuring that all supervisors at the center were aware of her condition. She claims that the efficacy of this effort by WPL was fatally undermined by Ross's persistent efforts to embarrass and humiliate her because of her diverticulosis. Her primary complaint centers upon his submission of the memorandum inquiring as to the status of her condition, the prospects for improvement, and any modifications in her employment duties necessitated by her condition. This effort to acquire updated information on Miranda's condition was well within the bounds provided for both in the statute and the regulations. *See* 42 U.S.C. § 12112(d)(4); 29 C.F.R. § 1630.14(c).

---

1. In addition, this question was appropriate for inquiry by virtue of a motion under Fed. R. Civ. P. 12(b)(6), which provides for dismissal of a complaint for failure to state a claim upon which relief may be granted. However, WPL neither availed itself of this rule in the district court nor raised the issue on appeal.

Miranda has failed to support her conclusory assertion that Ross attempted to humiliate and embarrass her because of her disability. The fact that Ross may have restricted her interpersonal communications with other employees seems entirely appropriate in light of his duty as a supervisor and his responsibility to ensure reasonably efficient use of employee time. Miranda has not demonstrated the existence of a genuine issue of material fact with respect to her constructive discharge claims. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Ariz. v. Cities Serv.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). We have little else to add to the district court's conclusion that Miranda's "vague allegations" do not support a claim of a hostile working environment. Conclusory and generalized assertions are not sufficient to survive a motion for summary judgment.

The judgment of the district court is AFFIRMED.